**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
CASE NO:**

BRANDI SUE BRUECKNER,

     Plaintiff,

v.

GRAY LOCAL MEDIA, INC. d/b/a WCSC,

     Defendant.

**COMPLAINT
AND
DEMAND FOR JURY TRIAL**

Plaintiff Brandi Sue Brueckner (hereinafter "Plaintiff" or "Ms. Brueckner"), by and through the undersigned counsel, complaining of the acts of Defendant Gray Local Media, Inc. d/b/a WCSC (hereinafter "Defendant" or "Gray Local Media"), hereby files this Complaint and alleges as follows:

**<u>INTRODUCTION</u>**

1.    This lawsuit seeks relief on behalf of Plaintiff Brandi Sue Brueckner, who was terminated from her position as a Media Executive within minutes of returning from federally-protected leave to care for her seriously ill spouse and due to her own serious illness, in violation of her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq*.

2.    Ms. Brueckner is an accomplished media professional with over 25 years of experience in the broadcast media sales industry. Throughout her career at Defendant Gray Local Media, Inc. d/b/a WCSC ("Gray Local Media" or "Defendant"), Ms. Brueckner consistently exceeded performance expectations and distinguished herself as a top performer in the sales department.

1

3.     Ms. Brueckner's exceptional sales record speaks for itself. In 2024, she closed over $500,000 in New Local Direct sales—far surpassing her $360,000 goal by approximately 39%. In 2025, she continued her outstanding performance, achieving 53% of her annual sales goal by early May and ranking at or near the top of her sales team. This success occurred while she served as the primary caregiver for her husband, who suffers from a traumatic brain injury.

4.     On or about June 11, 2025, Ms. Brueckner requested and was subsequently granted FMLA leave to care for her spouse during a period of serious health complications. The FMLA leave was approved from July 1, 2025, through August 15, 2025.

5.     Prior to and while on leave, Ms. Brueckner filed complaints with Defendant's Human Resources department on June 17 and July 3, 2025, expressing concerns about a hostile work environment, disproportionate scrutiny, and her fear that she was being constructively pushed out of her role for requesting FMLA leave.

6.     On August 18, 2025—the very day Ms. Brueckner returned to work following her approved FMLA leave—Defendant terminated her employment within ten minutes of her arrival. Defendant's local HR representative admitted to Ms. Brueckner that "the decision [to terminate] was made while you were out," providing direct evidence that the termination was predetermined during her protected leave period.

7.     The temporal proximity between Ms. Brueckner's FMLA leave and her immediate termination upon return, combined with the documented falsity of Defendant's stated reasons, demonstrates that Defendant's actions were retaliatory and in violation of the FMLA and South Carolina public policy.

8.      Plaintiff Brueckner seeks lost wages, compensatory damages, liquidated damages, injunctive relief, punitive damages, and attorneys' fees and costs pursuant to the FMLA to remedy Defendant's unlawful conduct.

9.      Plaintiff has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission for claims of discrimination and retaliation under Title I of the Americans with Disabilities Act of 1990 as amended (the "ADA"), 42 U.S.C. § 1201 *et seq.* Plaintiff's claims under the ADA, which involve the same transactions and occurrences as described in this Complaint, are currently under investigation by the EEOC. Upon receipt of a Notice of Right to Sue issued to Plaintiff, Plaintiff will amend this Complaint to include those claims requiring administrative exhaustion.

## PARTIES

10.     Plaintiff Brandi Sue Brueckner is a female citizen of South Carolina who maintains her residence in Daniel Island, Berkeley County, South Carolina.

11.     Ms. Brueckner was employed by Defendant from on or about August 29, 2022, to August 18, 2025.

12.     At all times alleged herein, Ms. Brueckner was an "employee" of Defendant within the meaning of 29 U.S.C. § 2611(3).

13.     Ms. Brueckner had been employed by Defendant for at least twelve (12) months preceding her request for FMLA leave and had worked at least 1,250 hours during the twelve (12) months preceding her leave.

14.     Defendant Gray Local Media, Inc. d/b/a WCSC: (i) is a corporation organized under the laws of one of the fifty states; (ii) is a wholly-owned subsidiary of Gray Media Group, Inc., a corporation with its principal place of business located at 4370 Peachtree Road NE, Suite 400,

Atlanta, GA 30319; and (iii) operates a broadcast television station at 2126 Charlie Hall Blvd, Charleston, SC 29414. Defendant is engaged in the business of broadcasting and selling advertising time on television stations.

15. At all relevant times, Defendant employed at least fifty (50) employees within seventy-five (75) miles of Plaintiff's worksite in Charleston, South Carolina. Accordingly, at all times alleged herein, Defendant was an "employer" within the meaning of 29 U.S.C. § 2611(4).

## JURISDICTION AND VENUE

16. This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331, because they arise under the laws of the United States, specifically the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq*. This action involves federal questions regarding the deprivation of Ms. Brueckner's rights under federal law.

17. The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201-02 and Federal Rules of Civil Procedure 57 and 65.

18. Venue is proper in this Judicial District under 28 U.S.C. § 1391(b)-(c), because a substantial part of the events or omissions giving rise to the claims herein occurred in this District. Specifically, Defendant committed the alleged unlawful employment practices in this District, and Ms. Brueckner performed her job responsibilities as an employee of Defendant in Charleston, South Carolina, at all relevant times herein.

19. The District of South Carolina, Charleston Division, has personal jurisdiction over Defendant because Defendant operates a business location at 2126 Charlie Hall Blvd, Charleston, South Carolina, where Ms. Brueckner was employed, and because the acts complained of and giving rise to the claims alleged herein occurred in this District.

4

20.     Defendant recruited and hired Ms. Brueckner to work in Charleston, South Carolina, where she worked throughout her employment with Defendant from on or about August 29, 2022, through August 18, 2025. Ms. Brueckner was informed about the termination of her employment at Defendant's Charleston, South Carolina, location.

21.     All events giving rise to Plaintiff's claims occurred in Charleston, South Carolina, including Plaintiff's request for FMLA leave, the approval of her leave, the adverse employment actions taken against her during and after her leave, her return to work on August 18, 2025, and her unlawful termination. The decision to terminate Ms. Brueckner was made and executed in Charleston, South Carolina.

22.     Plaintiff's FMLA claims do not require the exhaustion of administrative remedies as a prerequisite to filing this action. Ms. Brueckner has complied with all administrative prerequisites necessary to bring this action.

## STATEMENT OF FACTS

### A.     Plaintiff's Employment History and Strong Performance Record

23.     Ms. Brueckner is an accomplished media professional with over 25 years of experience in the broadcast media sales industry. Throughout her career, she developed strong connections within the Charleston market and consistently demonstrated exceptional sales performance.

24.     Defendant hired Ms. Brueckner as an Account Executive on August 29, 2022, working at WCSC's Charleston, South Carolina station. In or about February 2024, she was reclassified to Media Executive S. Ms. Brueckner's primary responsibilities included developing new business accounts, servicing existing clients, and generating advertising revenue through broadcast and digital media sales.

25. Ms. Brueckner initially earned a base salary plus commission, and in February 2024 transitioned to a 100% commission structure with a biweekly draw of $1,500. In 2024, her total compensation exceeded $115,000, demonstrating her exemplary performance and sales numbers.

26. In 2024, Ms. Brueckner closed over $500,000 in New Local Direct sales—far surpassing her goal of $360,000 by approximately 39%.

27. In 2025, Ms. Brueckner continued her outstanding performance, achieving 53% of her annual sales goal by early May and consistently ranked at or near the top of her sales team. Between April and July 2025, she closed approximately $101,000 in new business.

28. Throughout her employment, Ms. Brueckner received no warnings, disciplinary actions, or performance improvement plans prior to the events at issue. She was a valued, high-performing member of Defendant's sales team with an unblemished employment record.

**B.     Ms. Brueckner Requests FMLA Leave**

29. Ms. Brueckner has served as the primary caregiver for her husband, James Brueckner, who suffers from a traumatic brain injury and post-traumatic stress disorder resulting from an injury in 2011. Her husband's condition requires ongoing care and medical treatment.

30. In early June 2025, Mr. Brueckner's condition significantly deteriorated, requiring increased caregiving support and medical intervention. On or about June 10, 2025, Ms. Brueckner informed her supervisors, Jay Abbattista and David Furr, of her need for additional time off to address both her family's medical situation and her own health concerns and disability. This included a request for some flexible time to seek diagnostics regarding her own health condition in the immediate future.

31. On June 11, 2025, Ms. Brueckner formally requested FMLA leave to care for her spouse through Lincoln Financial Leave Services, the third-party administrator of Defendant's

FMLA leave program. Lincoln Financial received her leave request on June 11, 2025, at 11:55 AM and assigned Leave ID 17437886.

32.     Ms. Brueckner provided all required medical certifications from her husband's healthcare providers to Lincoln Financial. These certifications documented Mr. Brueckner's serious health condition and the medical necessity of Ms. Brueckner's absence from work to provide care.

33.     Ms. Brueckner also provided documentation from her own healthcare providers requesting leave for her own medical conditions – namely, anxiety, depression, and insomnia. These disabilities affect several major life activities, including but not limited to working, sleeping, and caring for herself.

34.     On or about June 26, 2025, Lincoln Financial approved Ms. Brueckner's FMLA leave request. The approved leave was designated as continuous leave beginning July 1, 2025, and ending August 6, 2025.

35.     On or about July 21, 2025, Ms. Brueckner had Mr. Brueckner's healthcare provider submit an extension request due to the ongoing nature of Mr. Brueckner's serious health condition.

36.     On July 22, 2025, Lincoln Financial approved the extension of Ms. Brueckner's FMLA leave through August 15, 2025.

37.     Ms. Brueckner complied with all notice and certification requirements under the FMLA. She provided timely notice of her need for leave, submitted all required medical documentation, and kept Defendant informed of her leave status throughout the leave period.

38.     Ms. Brueckner's approved FMLA leave ended on August 15, 2025. She used a total of 272 hours of FMLA leave and had 208 hours (5.20 weeks) of FMLA entitlement remaining. Ms. Brueckner returned to work on August 18, 2025, the first business day following the conclusion of her approved leave.

**C.** **Ms. Brueckner's Complaints of Retaliatory Treatment and FMLA Interference**

39.     On June 10, 2025, Ms. Brueckner emailed her supervisors, Jay Abbattista and David Furr, explaining her own significant health issues and the need for additional time off for medical testing while continuing to handle client matters.

40.     On June 11, 2025, Ms. Brueckner formally applied for FMLA leave.

41.     On or about June 12, 2025, she spoke by telephone with Gary Heichelbech, Corporate Director of Human Relations, raising concerns about FMLA interference and disability discrimination based on her own disability.

42.     Also on June 12, 2025, Ms. Brueckner spoke with Mr. Heichelbech and Kelly Ennis (Defendant's local HR representative) and reported concerning comments from Mr. Abbatista pressuring her to work through severe health issues and implying that other employees were able to do so. Ms. Bruckner explained that this behavior was dismissive and felt punitive because she was planning her own medical leave.

43.     During this conversation, Ms. Brueckner also raised concerns about a hostile work environment due to Mr. Abbatista's behavior and the lack of clear instructions leading up to her medical leave. These concerns were never addressed directly.

44.     Between June 12 and June 23, 2025, Ms. Brueckner observed new policies being drafted that appeared designed to create a paper trail in response to her complaints and concerns, rather than address those concerns. The policies were designed to and did penalize anyone who required medical leave or accommodations regarding a disability, establishing an environment that required employees to work through any illness or injury and implied that refusal to do so would impact the employees' jobs. The policies also tied expectations to initiatives about which Ms. Brueckner was never given any materials or information.

45.     Ms. Brueckner regularly requested assistance from HR and Mr. Abbatista in order to determine how to prepare her accounts for medical leave and how these policies, expectations, and procedures would affect her during leave, but she never received any clarity.

46.     On June 2, 2025, Ms. Brueckner drafted a detailed written complaint documenting the pattern of increased scrutiny, negative feedback, and her fear of retaliation for requesting FMLA leave.

47.     On July 2, 2025, while attempting to send her complaint, Ms. Brueckner's work email access was abruptly terminated. Only after she inquired about the email access did Kelly Ennis inform her that emails had been forwarded to Mr. Abbattista, and she should focus on taking leave.

48.     This abrupt disconnection also caused Ms. Brueckner to miss a previously scheduled client call, damaging her client relationship and revenue potential.

49.     On July 3, 2025, Ms. Brueckner resent her formal complaint to Gary Heichelbech from her personal email, stating that "it has begun to feel less like a leave of absence, and more like I'm being quietly, constructively moved out of my role" and that "my leave is silently being penalized."

50.     Ms. Brueckner's complaint detailed: (1) expectations emphasizing endurance over well-being with no clarity on leave expectations; (2) a pattern of negative-only feedback on minor inconsequential aspects of the job with no proactive support for the substantive aspects of the role; (3) disciplinary actions for minor, correctable issues applied inequitably; (4) the disproportionate use of formal memos only in connection with incidents involving her; and (5) silence from Abbatista after she closed major business.

9

51. Ms. Brueckner's complaint requested that Defendant formally review her concerns about discriminatory treatment, FMLA interference, and the inequitable application of performance standards during her protected leave.

52. After she followed up on the email on July 10, 2025, Gary Heichelbech acknowledged Ms. Brueckner's complaint on July 12, 2025, stating that he would address her concerns upon her return to work.

53. Defendant took no action to investigate Ms. Brueckner's complaints or address her concerns prior to her return from FMLA leave. Instead, Defendant retaliated against her for taking FMLA leave and complaining about retaliation and interference with FMLA leave by terminating Ms. Brueckner's employment within ten minutes of her return to work on August 18, 2025.

54. Ms. Brueckner's complaint apparently remained pending and under purported review, but no investigation was undertaken, and no findings were ever relayed to Ms. Brueckner.

**D.    Defendant's Retaliatory Conduct and Pretextual Termination**

55. Following Ms. Brueckner's FMLA request on June 12, 2025, Defendant subjected her to increased scrutiny, micromanagement, and a pattern of negative-only feedback that differed markedly from her treatment prior to requesting leave.

56. Jay Abbattista intensely scrutinized Ms. Brueckner's time management and whereabouts, questioning routine and uncontrollable traffic delays, and pressured her to work through health issues despite her documented medical needs and caregiving responsibilities.

57. In early June 2025, before her formal request but after making it clear to her colleagues and supervisors that she was going to need protected leave by discussing her husband's care needs and her own health issues, Mr. Abbattista criticized Ms. Brueckner for: (1) the format of a form she completed, despite the format matching a peer's form; (2) a delayed digital campaign,

despite Ms. Brueckner having uploaded the creative materials per digital team instructions and providing documentation of her follow-through demonstrating any delay was not caused by Ms. Brueckner; and (3) other minor, correctable issues that had never before resulted in formal written discipline and were similar to errors made by her peers which were never addressed in the same manner.

58.     Ms. Brueckner's peers were not subjected to the same scrutiny or penalized for the same actions.

59.     Mr. Abbattista offered no acknowledgment or support after Ms. Brueckner closed a $21,000 deal with Morris College just days before her leave, sending only a note to ensure the deal was signed and returned. Notably, Mr. Abbattista regularly publicly praised other sales executives for closings.

60.     Throughout the brief period leading up to her protected leave, Mr. Abbattista introduced new administrative forms and procedures and eliminated sales support roles, creating additional burdens for Ms. Brueckner while she managed her health concerns and prepared to take FMLA leave.  While applicable to all of the sales executives, the rules were often promulgated directly after and in response to Mr. Abbattista's criticism of Ms. Bruckner for following a standard and previously accepted process or procedure.

61.     Multiple clients contacted Ms. Brueckner directly after her termination, expressing confusion about her status and indicating they were unaware of any reassignment to or coverage by other account executives, demonstrating that Defendant failed to properly service her accounts during her absence.

11

62.     Furthermore, Ms. Brueckner's email access was cut off prior to leave, meaning she was unable to set up automated responses to direct customers in her absence.  Later, she was blamed for customer issues that arose during her leave.

63.     On August 18, 2025, Ms. Brueckner returned to work following the conclusion of her approved FMLA leave. Her email and login credentials had not been restored.

64.     Within ten minutes of Ms. Brueckner's arrival at work on August 18, 2025, Mr. Abbattista and Ennis called her into a meeting and informed her that she was being terminated effective that day.

65.     During the termination meeting, Ms. Brueckner requested the opportunity to clarify or respond to the alleged performance concerns that were raised for the first time in this meeting. Defendant denied her request and refused to allow any rebuttal or discussion about the alleged performance issues, none of which were legitimate.

66.     Ennis admitted to Ms. Brueckner during the termination meeting that "the decision [to terminate] was made while you were out" on FMLA leave.

67.     Defendant's purported reasons for Ms. Brueckner's termination are false and pretextual.  Ms. Brueckner was singled out because she exercised her rights under the FMLA and reported retaliation for doing the same.

68.     Prior to her leave and termination, Ms. Brueckner received no formal warning, no written reprimand, no performance improvement plan, and no opportunity to cure any alleged performance deficiencies. To the contrary, she was regularly rated as the top or one of the top salespersons in her group.

69.     The temporal proximity between Ms. Brueckner's return from FMLA leave on August 18, 2025, and her termination within ten minutes of arrival, along with other evidence

establishing that any purported reasons were pretextual, establishes a clear causal connection between her exercise of FMLA rights and complaints regarding retaliation and her termination.

70.    Within days of Ms. Brueckner's termination, multiple clients—including Dryer Vent Pros, Coastal Carolina Fair, and DFPro Agency—contacted Ms. Brueckner directly seeking invoices and proposals, demonstrating that her client relationships remained active and that Defendant had failed to properly service or transition her accounts during her leave and after her termination, and demonstrating her strong client relationships that transcended Defendant's failings.

### FIRST CLAIM FOR RELIEF

**Interference with Rights Under the Family and Medical Leave Act (29 U.S.C. § 2615(a)(1))**

71.    Paragraphs 1 through 70 above are realleged and incorporated herein by reference as though set forth in full.

72.    At all relevant times, Defendant employed at least 50 employees within 75 miles of Plaintiff's worksite in Charleston, South Carolina, and is a covered employer under the FMLA.

73.    At all relevant times, Ms. Brueckner was an eligible employee under the FMLA. She had worked for Defendant for at least twelve months and worked at least 1,250 hours during the twelve months preceding her request for leave.

74.    The FMLA entitles an eligible employee "to a total of 12 workweeks of leave during any 12-month period" to care for a spouse with "a serious health condition." 29 U.S.C. § 2612(a)(1)(C).

75.    Ms. Brueckner's husband suffered from serious health conditions, including traumatic brain injury and post-traumatic stress disorder, that required her care and support during the period of her FMLA leave.

13

76.     Ms. Brueckner gave Defendant adequate notice of her intention to take FMLA leave to care for her spouse, formally requesting leave on or about June 11, 2025.

77.     At all relevant times, Ms. Brueckner was meeting and/or exceeding the reasonable expectations of her employer.

78.     Defendant approved Ms. Brueckner's FMLA leave request through Lincoln Financial Leave Services, a third-party administrator tasked with processing and approving FMLA leave for Defendant. Her approved leave ran from July 1, 2025, through August 15, 2025.

79.     Defendant interfered with, restrained, and denied Ms. Brueckner's exercise of her FMLA rights by terminating her employment within ten minutes of her return from approved FMLA leave on August 18, 2025, based on a termination decision that was made while she was out on protected leave.  This interfered with Ms. Brueckner's right to reinstatement under the FMLA.

80.     Defendant further interfered with Ms. Brueckner's FMLA rights by creating a hostile work environment prior to her leave, subjecting her to increased scrutiny and negative-only feedback after she requested leave without any legitimate basis.

81.     As a direct and proximate result of Defendant's unlawful interference with her FMLA rights, Ms. Brueckner has suffered and continues to suffer damages, injuries, and losses and is entitled to any and all relief available under the FMLA.

**SECOND CLAIM FOR RELIEF**

**Retaliation in Violation of the Family and Medical Leave Act (29 U.S.C. § 2615(a)(2))**

82.     Paragraphs 1 through 81 above are realleged and incorporated herein by reference as though set forth in full.

83.     Ms. Brueckner engaged in protected activity under the FMLA by:

14

a.  Requesting FMLA leave on or about June 11, 2025, to care for her spouse with a serious health condition and for her own medical condition;

b.  Taking approved FMLA leave from July 1, 2025, through August 15, 2025;

c.  Making verbal complaints to Kelly Ennis and Gary Heichelbech on June 12, 2025, about FMLA interference and discriminatory treatment; and

d.  Making written complaints to Gary Heichelbech on July 3, 2025, expressing fear that her "leave is silently being penalized" and that she was being "quietly, constructively moved out of [her] role" for requesting FMLA leave.

84.  Defendant had actual knowledge of Ms. Brueckner's protected activity through her formal FMLA request processed by Lincoln Financial, her communications with HR representatives Kelly Ennis and Gary Heichelbech, management's involvement in the leave approval process, and her internal complaints regarding FMLA interference.

85.  Defendant took adverse employment actions against Ms. Brueckner by subjecting her to increased scrutiny and micromanagement after she requested leave, issuing negative feedback and disciplinary memos for minor issues that were not enforced against her peers or prior to her FMLA-protected activity, and terminating her employment within ten minutes of her return from approved FMLA leave on August 18, 2025.

86.  A strong causal connection exists between Ms. Brueckner's protected activity and her termination. The temporal proximity alone establishes causation—Ms. Brueckner was terminated within ten minutes of returning to work following her approved FMLA leave.

87.  Further evidence of the causal connection between Ms. Brueckner's protected activity and her termination includes, but is not limited to:

15

a. Kelly Ennis's direct admission to Ms. Brueckner that "the decision [to terminate] was made while you were out" on FMLA leave;

b. The demonstrably false and pretextual nature of Defendant's stated reasons for termination, which are contradicted by extensive documentary evidence of Ms. Brueckner's exceptional performance;

c. The timing of adverse actions coinciding with her FMLA request and complaints—increased scrutiny beginning in June 2025 after she informed management of her need for leave, and memos issued in late June 2025 immediately after her FMLA application;

d. Defendant's failure to provide any prior warning, written reprimand, or performance improvement plan;

e. Ms. Brueckner's unblemished employment record; and

f. The disparate treatment of Ms. Brueckner compared to other Account Executives who engaged in the same practices but were not subjected to termination.

88. As a direct and proximate result of Defendant's unlawful retaliation, Ms. Brueckner has suffered and continues to suffer damages, injuries, and losses and is entitled to any and all relief available under the FMLA.

## JURY DEMAND AND PRAYER FOR RELIEF

**WHEREFORE**, Ms. Brueckner respectfully requests a trial by jury on all issues so triable. Ms. Brueckner further requests that this Court enter judgment in her favor and against Defendant, and grant the following relief:

a. Appropriate declaratory and other injunctive and/or equitable relief;

b. Compensatory damages for lost wages, benefits, and all economic losses;

c.  Liquidated damages;

d.  Punitive damages to the extent allowed by law;

e.  Pre- and post-judgment interest at the lawful rate;

f.  Reasonable attorneys' fees and costs/expenses; and

g.  For such other and further relief that the Court deems just and proper.

This the 23rd day of April, 2026.

**THE NOBLE LAW FIRM, PLLC**

*/s/ Victoria T. Kepes*
Victoria T. Kepes, Esq. (FBN 13000)
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
Telephone: (843) 608-9952
Facsimile: (919) 869-2079
Email: vkepes@thenoblelaw.com

*Attorneys for Plaintiff*

17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION
CASE NO:**

| | |
|---|---|
| BRANDI SUE BRUECKNER, | |
| Plaintiff, | |
| v. | **VERIFICATION** |
| GRAY LOCAL MEDIA, INC. d/b/a WCSC, | |
| Defendant. | |

I, Brandi Sue Brueckner, declare as follows:

1.  I am the Plaintiff in the foregoing Complaint and Demand for Jury Trial (the "Complaint").

2.  I have read the foregoing Complaint, and upon information and belief, its contents and matters set out therein are true in substance and in fact; and if called on to testify, I would competently testify as to the matters stated in the foregoing Complaint.

3.  I declare under penalty of perjury under the laws of the United States of America that the factual statements in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief.

Executed this the 23rd day of April, 2026.

_Brandi Brueckner_
Brandi Brueckner (Apr 23, 2026 10:46:07 EDT)
Brandi Sue Brueckner

1